Lauren F. McKelvey (admitted *pro hac vice*)
David N. Tabakin (admitted *pro hac vice*)
**REITLER KAILAS & ROSENBLATT LLP**
885 Third Avenue, 20th Floor
New York, NY 10022
Telephone:     (212) 209-3045
Email:         LMckelvey@reitlerlaw.com
               DTabakin@reitlerlaw.com

Counsel for Jean Pierre Bommel

Leonard M. Shulman - Bar No. 126349
Melissa Davis Lowe - Bar No. 245521
**SHULMAN BASTIAN FRIEDMAN BUI & O'DEA LLP**
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone:     (949) 340-3400
Facsimile:     (949) 340-3000
Email:         LShulman@shulmanbastian.com
               MLowe@shulmanbastian.com

Local Counsel for Jean Pierre Bommel

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:22-bk-11181-MB |
| **NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTES, INC.,** | Chapter 11 (Sub Chapter V) |
| Debtor. | **JEAN PIERRE BOMMEL'S OPPOSITION TO CHAPTER 11 PLAN FIDUCIARY'S MOTION FOR TURNOVER OF RECORDED INFORMATION RELATING TO THE DEBTOR'S PROPERTY OR FINANCIAL AFFAIRS IN THE POSSESSION OF ITS FORMER DIRECTORS; DECLARATION OF JEAN PIERRE BOMMEL IN SUPPORT THEREOF** |
| | **Hearing** Date:      July 17, 2025 Time:      1:30 p.m. Via ZoomGov[1] |

[1] Please refer to Supplemental Notice of Hearing To Be Held Remotely Using ZoomGov Audio and Video [Docket No. 331] filed on June 27, 2025.

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

1

**TO THE HONORABLE MARTIN BARASH, TO THE MOVING PARTY, AND TO ALL OTHER INTERESTED PARTIES:**

Jean Pierre Bommel ("Bommel") hereby submits his Opposition[2] to the Motion of the Chapter 11 Plan Fiduciary ("Movant") For Turnover of Recorded Information Relating to the Debtor's Property or Financial Affairs in the Possession of Its Former Directors ("Motion") as follows:

## I.    SUMMARY OF ARGUMENT

The Motion seeks to compel turnover of "recorded information" of National Association of Television Program Executives, Inc., the debtor herein ("Debtor"), under 11 U.S.C. § 542(e). However, the Motion fails to meet the strict and narrow requirements for turnover under Section 542(e). The Motion must be denied for the following reasons which will be discussed in greater detail below: (1) the Motion is procedurally improper because there is a pending adversary proceeding and a turnover motion is not a substitute for an adversary proceeding under the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rule(s)") 7001(1); (2) Movant has not met his burden of showing that Bommel has failed to turnover "recorded information" of the Debtor; and (3) Bommel has, and continues to cooperate to provide records presently in his possession, but he has very little records under his control, as his access to all of the Debtor's accounts and files was shut off when the sale of substantially all of the Debtor's assets closed in January 2023.

Moreover, Bommel vehemently denies any allegation in the Motion, whether implied or made outright, that he has engaged in any improper conduct. Bommel has not doctored or otherwise altered any of the documents that he has produced thus far. Rather, he only has copies because his access to all accounts of the Debtor ceased after the sale of substantially all of the Debtor's assets in January 2023. Further, Bommel has not withheld information. Again, he has provided the documents to which he has access, which access is limited because he no longer has access to any of his accounts or files with the Debtor after the sale and transfer of all systems and accounts to the buyer. Accordingly, the Motion must be denied.

---

[2] Upon Bommel's request, and given the intervening July 4, 2025 holiday, Movant agreed to extend Bommel's deadline to file an opposition to the Motion to July 7, 2025.

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

## II.    FACTUAL BACKGROUND RELEVANT TO OPPOSITION

On October 11, 2022 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code.

On or about October 3, 2022, prior to the Petition Date, Bommel's employment with the Debtor was terminated and instead, he was retained by the Debtor as a consultant/independent contractor.

On January 6, 2023, the Court entered an order approving the sale of substantially all assets of the Debtor (the "Sale") to the buyer, Brunico Communications Ltd. ("Buyer").  *See*, Docket No. 59.  The Sale closed on or about January 17, 2023, resulting in the transfer of substantially all of the Debtor's assets to the Buyer.  At such time, Bommel surrendered and transferred all of the Debtor's systems and files in his possession to the Buyer, using Integritek.  After that, Bommel's access to all accounts, records, and other files of the Debtor, including but not limited to his One Drive, Outlook, and Dropbox accounts, ceased entirely.  Following the Sale, Bommel had no further access to any of the Debtor's systems, accounts, or files.

In September 2024, multiple parties, including but not limited to the Debtor, Bommel, and Fontainebleau attended arbitration in an effort to reach a resolution on the terms of a consensual plan of reorganization.  At the arbitration, it was discussed and agreed that any claims against the former directors (including Bommel) would be limited to avoidance claims and not claims for wrongful conduct.  In such light, it was further discussed and agreed that discovery would be limited so that the former officers and directors were not overburdened or required to expend resources engaging in further litigation, again other than as to potential avoidance claims.

Arbitration was successful, and on September 17, 2024, the Court entered an order confirming the Debtor's plan [Docket 258] ("Confirmation Order").  Pursuant to the Confirmation Order, the Movant was appointed as the Plan Fiduciary pursuant to the terms set forth in Exhibit D to the plan ("Plan Fiduciary Terms").  Of importance here, Exhibit D states clearly:

> The Plan Fiduciary may investigate and pursue any and all claims, <u>subject only to the following limitations</u>:
>
> • Recovery on claims against directors and officers relating to the breach of their duties as directors and officers shall be limited to the

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

3

<u>D&O insurance policy</u>. This limitation shall not apply to claims related to any funds paid by NATPE to directors and/or officers.

• No claims shall be brought against The Lippin Group related to services it performed for NATPE or to payments it received from NATPE.

• <u>No claims shall be brought against JP Bommel relating to the value of services performed by him</u>; provided, however, that claims may be brought against him related to the avoidance of deferred compensation, severance, and preferential payments.

• No claims shall be brought against Arnold Peter or Peter Law Group relating to the value of services performed by them prepetition

• Arnold P. Peter, Peter Law Group, JP Bommel, and NATPE's directors & officers and the D&O insurance carrier reserve all defenses and counterclaims (to be used as offsets only) to any claims alleged or brought by the Plan Fiduciary.

(Emphasis supplied.)

Ignoring the clear language of the Plan Fiduciary Terms, on October 11, 2024, the Plan Fiduciary filed a Complaint against multiple parties, commencing Adversary Case No. 1:24-ap-01055-MB (the "Adversary Case"), which included claims against Bommel relating to the value of services performed by him and for breach of fiduciary duty. Specifically of note, and in addition to avoidance claims, the Plan Fiduciary named Claims for Relief against Bommel as follows: (1) breach of fiduciary duty; (2) corporate waste; (3) unjust enrichment; and (4) conversion. A copy of the Complaint is attached to the Declaration of Jean Pierre Bommel ("Bommel Declaration") as Exhibit 1.

As described in more detail in the Motion and in the Bommel Declaration, Bommel and the Movant have engaged in various correspondence and negotiations, and Bommel has voluntarily provided information and documents to Movant informally over the past few months.

### III.    ARGUMENT IN SUPPORT OF OPPOSITION

#### A.    The Motion is Procedurally Defective

The Motion is procedurally defective and, on such grounds, alone, must be denied. In particular, there is an adversary proceeding pending to which Bommel has been named a defendant, namely the Adversary Case. While Bommel contends the non-avoidance claims plead against him are wholly improper, the Adversary Case remains currently pending and Movant is Plaintiff in the

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

4

Adversary Case.  As such, discovery is available to Movant under Part VII of the Bankruptcy Rules.

Movant cannot be allowed to circumvent the discovery rules applicable to the Adversary Case, and

instead seek turnover in the main bankruptcy case without following proper protocols for discovery.

Moreover, Bankruptcy Rule 7001(a) requires an adversary proceeding if such proceeding is:

> a proceeding to recover money or property—except a proceeding to compel the debtor to deliver property to the trustee, a proceeding by an individual debtor to recover tangible personal property under §542(a), or a proceeding under §554(b), §725, Rule 2017, or Rule 6002.

Accordingly, the Motion is not proper, and Movant should be required to seek the documents

requested using the discovery rules in Part VII of the Bankruptcy Rules or bringing an adversary

proceeding as required by Rule 7001(a). Despite this procedural deficiency, and as indicated herein,

Bommel has provided substantially all of the documents that remained in his custody and control as

of July 3, 2025. It is possible that certain documents remain on an old portable usb drive or in an

unused personal Google drive. As indicated below, Bommel will further review his personal devices

and files for corporate documents and upon consultation with his counsel and certain protections,

surrender any materials found.

**B.** **Movant Fails to Demonstrate That Bommel is in Possession of Recorded Information of the Debtor**

Even if the Court finds the Motion is proper and discovery is not required, Movant fails to

meet his burden that his request is in fact for recorded information of the Debtor.  The Motion only

seeks relief under Section 542(e).  Section 542(e) states as follows:

> Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

The moving party "must carry an initial burden to establish that the Documents 'relat[e] . . .

to the debtor's property or financial affairs.'" *In re Heritage Org., L.L.C.,* 350 B.R. 733, 740 (Bankr.

N.D. Tx. 2006).  Under Section 542(e), the turnover request must be narrowly tailored to "recorded

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

5

information" related to the debtor's financial affairs, and not a fishing expedition.  *See, e.g.*, *In re Dinubilo,* 177 B.R. 932, 941 (E.D. Cal. 1993) (discussing Bankruptcy Rule 2004 examinations post-commencement of an adversary proceeding and general need for use of discovery to obtain information post-adversary commencement).  Finally, Section 542(e) does not abrogate privilege protections. *See, In re Bame*, 279 B.R. 833, 836 (Bankr. D. Minn. 2002) (Section 542(e) does not "strip a person of legitimate privileges".).

Here, Movant fails to meet his burden of proof and seeks more than "recorded information" of the Debtor.  For example, Movant seeks turnover of specific items such as the laptop and hard drive, as well as seeking personal property of Bommel.  At the very least, Movant's request must be limited to only specific "recorded information" of the Debtor.

Further, even if the Movant's requests are limited solely to "recorded information" of the Debtor, Bommel is not in possession or control of most of the Debtor's "recorded information."  To wit, after the closing of the Sale, all of Bommel's  accounts were shut down and he no longer had access to company files.  The only files he still has are copies. Nevertheless, Bommel has attempted to try to comply to the greatest extent possible.[3]  It should also be noted that on July 3, 2025, Bommel's counsel turned over to Movant's counsel all files on the external hard drive and MacBook.

Finally, Movant appears to request access to Bommel's personal accounts.  Such request is not proper and must be denied.  Section 542(e) only permits the turnover of "recorded information" related to the of the Debtor.  11 U.S.C. §542(e).  Any personal items or accounts of Bommel are not subject to turnover according to the specific language of Section 542(e).

For all these reasons, Bommel submits the Motion should be denied.

---

[3] Despite attempts to paint him to the contrary, Mr. Bommel is not an evil mastermind behind a year's long fraud editing corporate documents in the background and attempting to pass the same off as originals. His access was terminated commensurate with the Sale and what documents he retained were on devices in storage that were out of sight and out of mind. Following several discussions with counsel, Mr. Bommel's recollection was refreshed, the devices were retrieved, and documents inventoried for turnover.

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

**C.    Bommel Has Turned Over All Recorded Information In His Possession**

Below, Bommel attempts to respond to each item specified by Movant in the Motion for turnover:

1.    Emails and files from jpbommel@outlook.com.  This is a personal email account of Bommel that did not exist until after the Sale and after his access to his email account for the Debtor was shut down.  As such, this outlook account contains no recorded information of the Debtor.

2.    Emails and files from bommeljp@gmail.com.  Bommel does not believe this account contains any "recorded information" of the Debtor, but he will search for any and turn over such information if it exists.  Even if it does exist, such files would only be copies and would not be original files as Bommel's access was shut down in January 2023.  To the extent Movant seeks unfettered access to Bommel's personal Gmail account, this is not proper under the clear language of Section 542(e).

3.    Google Drive.  The Google drive is a personal account, and Bommel is uncertain whether any recorded information of the Debtor is contained in such account.

4.    Dropbox.  Same as the above, Bommel lost access to the Debtor's Dropbox account after the Sale.  Bommel rarely used the Dropbox account in any event and understood it was used by production to prepare for shows.  The Dropbox account was used primarily, if not entirely, for operation purposes such as storing all assets, logos, clips, etc. for a particular show.

5.    Native files.  Bommel does not have all of the native files.  Bommel's access to the Debtor's files and accounts was shut off following the Sale in January 2023, so at most he would only have copies of the Debtor's files.  To the best of his knowledge, the native files that he does have were turned over on July 3, 2025.  He previously provided pdf files to Movant's counsel because he speculated that is how counsel would prefer to receive the documents.  To be clear, though, Bommel did not convert any documents, intentionally or otherwise.  He accessed and opened the pdf document in order to provide it to Movant's counsel which may have attached a 2025 date to the pdf document.  He did not, however, convert or create any documents in pdf; rather, the document already existed in pdf format and he merely opened the document in order to provide

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

7

1  it to counsel in pdf as he expected Movant's counsel would prefer the pdf copy as opposed to the

2  Word or Excel copy.

3      6.    ThinkPad.   The ThinkPad was purchased for a different employee because his

4  computer had crashed.  After giving the Think Pad to such employee, Charlie Weiss, Bommel has

5  never been in possession of the ThinkPad.

6      7.    MacBook and external hard drive.   Bommel has turned over all "recorded

7  information" of the Debtor that was stored on the MacBook and the external hard drive.  Turnover

8  of such items themselves is not proper under Section 542(e) because it is not "recorded information"

9  and moreover, it contains personal information of Bommel, which he cannot be compelled to

10  turnover under Section 542(e).

11                    **IV.    <u>CONCLUSION</u>**

12      Based on all of the above, Bommel submits that he has complied with all requests for

13  documents outside formal discovery requests in the Adversary Case (there have been none) to the

14  best extent possible, and any further requests for turnover would not be proper under Section 524(e);

15  as such, the Motion should be denied.

16                    Respectfully Submitted,

17                    **SHULMAN BASTIAN FRIEDMAN BUI & O'DEA LLP**

18  DATED:  July 7, 2025          By:          /s/ Melissa Davis Lowe

19                                Leonard M. Shulman
                                  Melissa Davis Lowe
20                                Local Counsel for Jean Pierre Bommel

21

22

23

24

25

26

27

28

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

8

# DECLARATION

## <u>DECLARATION OF JEAN PIERRE BOMMEL</u>

I, Jean Pierre Bommel, declare as follows:

1.    I am one of the parties to which the Motion of the Plan Fiduciary for Turnover of Recorded Information Relating to the Debtor's Property or Financial Affairs in the Possession of Its Former Directors ("Motion") (Docket No. 319) is directed.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief, and as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.    I make this declaration in support of my Opposition to the Motion.  Capitalized terms not otherwise defined herein shall have the meaning set forth in the Opposition.

3.    Before the Petition Date, I was employed by the Debtor as the Debtor's CEO and President.

4.    On October 3, 2022, prior to the Petition Date, my employment with the Debtor was terminated, and thereafter I was retained by the Debtor as a consultant/independent contractor.

5.    The Sale of the Debtor's assets to the Buyer closed on or about January 17, 2023, resulting in the transfer of substantially all of the Debtor's assets to the Buyer.

6.    At such time, I surrendered and transferred all of the Debtor's systems and files in my possession to the Buyer using Integritek.  After that, my access to all accounts, records, and other files of the Debtor, including but not limited to my One Drive, Outlook, and Dropbox accounts, ceased entirely. I had no further access to any of the Debtor's systems, accounts, or files.  Accordingly, all or almost all of the Debtor's records that I still have are mere copies and not original documents.

7.    In September 2024, multiple parties, including but not limited to the Debtor, myself, and Fontainebleau attended arbitration in an effort to reach a global resolution on the terms of a consensual plan of reorganization.  At the arbitration, it was discussed and agreed that any claims against the former directors (including myself) would be limited to avoidance claims and not claims for wrongful conduct.  It was my understanding from speaking to the arbitrator that the settlement would result in limiting discovery and litigation so that the former officers and directors were not

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

9

overburdened with onerous discovery requests or required to expend significant resources engaging in further litigation, other than as to potential avoidance claims.

8.      Arbitration was successful, and on September 17, 2024, the Court entered an order confirming the Debtor's plan (the "Confirmation Order") (Docket No. 258).  Pursuant to the Confirmation Order, the Movant was appointed as the Plan Fiduciary pursuant to the terms set forth in Exhibit D to the plan.

9.      On October 11, 2024, the Plan Fiduciary filed a Complaint against multiple parties, including against me, commencing Adversary Case No. 1:24-ap-01055-MB (the "Adversary Case").  A copy of the Complaint is attached hereto as Exhibit 1.

10.     I have tried my best to cooperate and comply with all reasonable requests from the Movant for turnover of the Debtor's files.  As noted in the Motion, through my counsel, I have provided responses to Movant's questions and produced certain documents in response to Movant's informal requests.

11.     On July 3, 2025, I understand that my counsel sent to Movant's counsel a link that contains everything I downloaded from the external hard drive and the MacBook that related to records of the Debtor.  When Movant made his first request for documents, I had forgotten about the hard drive and the MacBook.  It was not until Movant specifically requested these items and I visited my storage unit that I remembered I had them.

12.     Movant mentions 5,000 pages of documents that were shared at arbitration.  I do not have access to the full 5,000 pages of documents.  To the best of my knowledge, those documents were provided to the arbitrator by Mr. Peter.  For the avoidance of doubt, I am not attempting to point a proverbial finger at Mr. Peter, I am merely indicating that I do not believe that I was the party responsible for providing those documents at the arbitration.

13.     I am also not in possession of the ThinkPad referenced in the Motion.  The ThinkPad was purchased for use by Mr. Charles Weiss, former head of sales, and provided to Mr. Weiss.  I do not know the current location of the ThinkPad.

///

///

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

10

14.     I have not converted or altered, intentionally or otherwise, any of the documents I provided in response to Movant's requests. I have no desire to be difficult or evasive, but I would like to limit the time and expense I am required to expend.  I have provided substantially all of the documents that remained in my custody and control after the Sale.  It is possible that certain documents remain on an old portable usb drive or in an unused personal Google drive or in personal email accounts.  I will further review my personal devices and files for corporate documents and upon consultation with my counsel, will surrender any materials found.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 7, 2025 at  Fort Lauderdale                        .


_JP Bommel_____
Jean Pierre Bommel

SHULMAN BASTIAN
FRIEDMAN BUI &
O'DEA LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

11

# EXHIBIT 1

1   MEGHANN A. TRIPLETT (SBN 268005)
    *Meghann@MarguliesFaithLaw.com*
2   SAMUEL M. BOYAMIAN (SBN 316877)
    *Samuel@MarguliesFaithLaw.com*
3   **MARGULIES FAITH LLP**
    16030 Ventura Boulevard, Suite 470
4   Encino, CA 91436
    Telephone: (818) 705-2777
5   Facsimile: (818) 705-3777

6   Attorneys for Plaintiff, Jeremy W. Faith,
    Chapter 11 Plan Fiduciary
7

**FILED**

**OCT 11 2024**

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

8           **UNITED STATES BANKRUPTCY COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
9              **SAN FERNANDO VALLEY DIVISION**

10

| | |
|---|---|
| 11  In re: | Case No.:  1:22-bk-11181-MB |
| 12  NATIONAL ASSOCIATION OF TELEVISION PROGRAM EXECUTIVES, INC., | Chapter:    11 (Subchapter V) |
| 13 | Adv. Case No.: |
| 14                    Debtor. | **COMPLAINT FOR:** |
| 15  JEREMY W. FAITH, Chapter 11 Plan Fiduciary, | **(1)  BREACH OF FIDUCIARY DUTY;** |
| 16                    Plaintiff, | **(2)  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** |
| 17  v. | **(3)  CORPORATE WASTE;** |
| 18  JEAN PIERRE BOMMEL, an individual; ARNOLD P. PETER, an individual d/b/a PETER LAW GROUP, and DOES 1-50, inclusive, | **(4)  NEGLIGENCE;** |
| 19 | **(5)  AVOIDANCE OF FRAUDULENT TRANSFERS WITH ACTUAL INTENT [11 U.S.C. § 548(A)(1)(A)];** |
| 20 | |
| 21                    Defendants. | **(6)  AVOIDANCE OF CONSTRUCTIVELY FRAUDULENT TRANSFERS [11 U.S.C. § 548(A)(1)(B)];** |
| 22 | **(7)  AVOIDANCE OF 1-YEAR TRANSFERS [11 U.S.C. § 547];** |
| 23 | |
| 24 | **(8)  AVOIDANCE OF UNAUTHORIZED POSTPETITION TRANSFERS [11 U.S.C. § 549];** |
| 25 | **(9)  CONVERSION;** |
| 26 | **(10) RECOVERY OF AVOIDED TRANSFER [11 U.S.C. § 550];** |
| 27 | **(11) UNJUST ENRICHMENT; AND** |
| 28 | **(12) DISALLOWANCE OF PROOF OF CLAIM [11 U.S.C. § 502(d)]** |

**EXHIBIT 1**

Plaintiff Jeremy W. Faith ("Plaintiff"), the chapter 11 Plan Fiduciary for the chapter 11 bankruptcy estate ("Estate") of reorganized debtor National Association of Television Program Executives, Inc., (the "Debtor" or "NATPE"). Plaintiff brings this adversary proceeding on behalf of the Estate pursuant to 11 U.S.C. §§ 1123(b)(3)(B) and 1104(d) and this Court's *Order Confirming Second Amended Subchapter V Chapter 11 Plan with Modifications* appointing Plaintiff as the Plan Fiduciary for the Estate (Dkt. No. 258). As Plaintiff was not appointed until after NATPE filed bankruptcy, Plaintiff does not have personal knowledge of the facts alleged in this Compliant and therefore alleges those facts on information and belief.

## JURISDICTION AND VENUE

1.     In accordance with the requirements of Local Bankruptcy Rule 7008-1, the San Fernando Valley Division of the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334, because the claims asserted herein arise under title 11 of the United States Code or arise in or relate to the Chapter 11 case of the Debtor currently pending in the United States Bankruptcy Court for the Central District of California, as *In re National Association of Television Program Executives, Inc.*, Case Number 1:22-bk-11181-MB (the "Bankruptcy Case"). The outcome of this adversary proceeding will have a significant effect on the Estate because it will impact the disposition property of the Estate and the amount of money available for distribution to creditors. Certain of the claims for relief alleged in this Complaint constitute core proceedings under 28 U.S.C. § 157(b). Regardless of whether this proceeding is a core proceeding, consent is given to the entry of a final orders and judgment by the Bankruptcy Court. Each defendant is hereby notified that hat Fed. R. Bankr. P. 7008(a) requires each defendant to plead whether the claims for relief alleged against such defendant are core or non-core and, if non-core, whether consent is given to the entry of final orders and judgment by the Bankruptcy Court. Certain of the claims for relief alleged in this Complaint constitute core proceedings under 28 U.S.C. § 157(b). Regardless of whether this proceeding is a core proceeding, consent is

EXHIBIT 1

1   given to the entry of a final orders and judgment by the Bankruptcy Court.  Each defendant

2   is hereby notified that that Fed. R. Bankr. P. 7008(a) requires each defendant to plead

3   whether the claims for relief alleged against such defendant are core or non-core and, if

4   non-core, whether consent is given to the entry of final orders and judgment by the

5   Bankruptcy Court.

6          2.      Venue is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408

7   and 1409 because the Bankruptcy Case is pending in this district and division. Pursuant

8   to 28 U.S.C. § 1391, venue is also appropriate in this district and division because each

9   of the defendants either resides in or is authorized to and regularly does carry out

10  business in this district and many of their wrongful acts, omissions and/or conduct as

11  complained of in this Complaint took place within this district.  Accordingly, this Court

12  also has personal jurisdiction over each of the defendants.

13                                      **PARTIES**

14         3.      Plaintiff Jeremy W. Faith ("Plaintiff") is the Chapter 11 Plan Fiduciary of the

15  Debtor's Estate and brings this action solely in his capacity as the chapter 11 Plan

16  Fiduciary for the debtor's Estate.

17         4.      Plaintiff is informed and believes that at all relevant times herein, Defendant

18  Jean Pierre Bommel ("Bommel") is the former President and CEO of the Debtor and is

19  subject to the jurisdiction of this Court.

20         5.      Plaintiff is informed and believes that Bommel is an insider of the Debtor as

21  that term is defined under 11 U.S.C. § 101(31).

22         6.      Plaintiff is informed and believes that at all relevant times herein, Defendant

23  Arnold P. Peter, doing business as Peter Law Group ("Peter") is the former outside general

24  counsel for NATPE and subject to the jurisdiction of this Court.  (Bommel and Peter are

25  collectively referred to herein as the "Defendants").

26         7.      Plaintiff is informed and believes that Peter is an insider of the Debtor as that

27  term is defined under 11 U.S.C. § 101(31).

28         8.      Defendants Does 1 through 50, inclusive, are individually and/or jointly liable

                                            2                      EXHIBIT 1

1 │ to the Estate for the conduct alleged below.  The true names and capacities, whether

2 │ individual, corporate, associate or otherwise, of those Doe defendants are currently

3 │ unknown to Plaintiff.  Accordingly, Plaintiff sues defendants Does 1 through 50, inclusive,

4 │ by said fictitious names and will amend this Complaint to allege their true names and

5 │ capacities when ascertained with certainty.  Each of the Doe defendants is an immediate

6 │ or mediate transferee of the fraudulent, preferential, or other avoidable transfers alleged

7 │ in this Complaint or of the proceeds of such fraudulent, preferential, or other avoidable

8 │ transfers, and did not take such property for value, in good faith, and without knowledge

9 │ of the avoidability of such transfers, or is otherwise liable along with the named defendants

10 │ for the wrongful acts and omissions and damages alleged in this Complaint.

11 │ **GENERAL ALLEGATIONS**

12 │       9.      NATPE is a non-profit corporation organized under the laws of the State of

13 │ Delaware.  Until shortly after its bankruptcy filing, the company was operating as a global

14 │ content association and professional membership organization consisting of television,

15 │ media executives and other members of the content business. NATPE's main source of

16 │ revenue was its annual conference and market.

17 │       10.     From at least 2020, Bommel was the President and CEO of the Debtor who

18 │ was ultimately responsible for overseeing the day-to-day business operations and

19 │ financial performance of NATPE and involved in supervising all aspects of NATPE's

20 │ financial affairs. Other high-level executives with NATPE in the years leading up to the

21 │ Bankruptcy Case were Charlie Weiss, Senior Vice President of Sales, Marketing, and

22 │ Content, Wayneston Harbeson, Senior Vice President of Event and Operations, Gary

23 │ Mitchell, European Business Development Executive, and Mingfen Lee, Director of

24 │ Business Development and Client Relations (collectively with Bommel, the "Executive

25 │ Team").

26 │       11.     In the years leading up to the Bankruptcy Case and after, Bommel, the

27 │ Executive Team and the Board of Directors were advised by Peter as their primary outside

28 │ general counsel. Plaintiff is informed and believes that Peter served in the role as general

3

EXHIBIT 1

1   outside counsel for NATPE for more than 10 years. In the months leading up to the filing

2   of the Bankruptcy Case, Peter was working on multiple matters for NATPE, billing the

3   organization for several hundred thousand dollars in legal fees.

4       12.   At all relevant times herein, NAPTE's primary revenue source was derived

5   from various income streams associated with the production of industry related

6   conferences, with additional income derived from grants, contributions and investment

7   income. NATPE's Form 990 federal income tax return for the fiscal year ending March 31,

8   2020 (the "3/31/20 Tax Return") reflected program service revenue of $6,333,273,

9   contributions and grants of $567,788, investment revenue of $90,100, and other revenue

10  of $82,406, for total revenue of $7,073,567. Total expenses for the fiscal year were

11  $7,621,288, which generated a loss of $547,721. On the balance sheet side of the 3/31/20

12  Tax Return, NATPE showed total assets of $6,381,734, and liabilities of $2,471,930,

13  leaving a net asset balance of $3,909,804.

14      13.   On or around October 24, 2018, NATPE entered into two contracts with

15  Fontainebleau  Florida  Hotel,  LLC  d/b/a  Fontainebleau  Miami  Beach  Hotel

16  ("Fontainebleau") for the hosting of NATPE's two large annual conferences at

17  Fontainebleau's hotel property in Miami, Florida. The first contract was for the NATPE

18  Market & Conference 2021 (the "2021 Event"), to be held on January 14 to January 27,

19  2021 (the "2021 Event Agreement"). The second contract related to the NATPE Market &

20  Conference 2022 (the "2022 Event"), to be held on January 13 to January 26, 2022 (the

21  "2022 Event Agreement").

22      14.   On October 16, 2020, NATPE cancelled the 2021 Event. NATPE identified

23  the rise of COVID-19 as its basis for cancellation and asserted the *force majeure* provision

24  under the 2021 Event Agreement as grounds for the cancellation.  Fontainebleau disputed

25  the applicability of the *force majeure* provision. The parties ultimately agreed to settle the

26  dispute over the cancellation of the 2021 Event Agreement and entered into a Settlement

27  Agreement dated May 24, 2021 (the "Settlement Agreement").

28      15.   Pursuant to the Settlement Agreement, NATPE agreed to pay Fontainebleau

EXHIBIT 1

1   a total of $100,000.00 as "Cancellation Damages" for the 2021 Event, to be paid in four

2   equal installments of $25,000.00 as well as Fontainebleau's retention of the $75,000.00

3   deposit paid by NATPE in connection with the 2021 Event Agreement. The last installment

4   payment under the Settlement Payment was due on or after January 31, 2022.

5         16.     NATPE's cancellation of the 2021 Event had a dramatic impact on the

6   organization's finances. Pursuant to NATPE's Form 990 federal income tax return for the

7   fiscal year ending March 31, 2021 (the "3/31/21 Tax Return"), NATPE had program service

8   revenue of only $1,127,425, contributions and grants of $305,679, and investment income

9   of $67,341, coming to a total revenue figure of $1,500,445 – a 78% drop from the prior

10   fiscal year. The balance sheet portion of the 3/31/21 Tax Return reflected assets of

11   $3,714,252 and liabilities of $679,570, leaving a net asset value of $3,034,682. These

12   figures reflected an erosion of the gross asset value of NATPE of $2,667,482.

13         17.     NATPE remained in operation throughout 2021 and was promoting the 2022

14   Event at the Fontainebleau, with the organization counting on the event as an important

15   step towards NATPE's financial recovery and stability. However, after internal

16   deliberations by and amongst certain members of the Executive Team and Peter, NATPE

17   elected to cancel the 2022 Event, informing Fontainebleau of such cancellation on January

18   8, 2022 - just 5 days before the 2022 Event was set to start. As it did when cancelling the

19   2021 Event, NATPE through Bommel and under the legal guidance of Peter sought to

20   invoke the *force majeure* provision of the 2022 Event Agreement as grounds for

21   termination of the contract.

22         18.     Fontainebleau swiftly and vigorously disputed the basis for NATPE's

23   cancellation and asserted that NATPE was liable for cancellation damages amounting to

24   $3,389,618.69 pursuant to the "Cancellation Schedule" agreed to by the parties in the

25   2022 Agreement (the "FB Liquidated Damages"). Furthermore, Bommel directed NATPE

26   to breach the Settlement Agreement by not making the final $25,000.00 payment owed to

27   Fontainebleau under the Settlement Agreement. Plaintiff is informed and believes that

28   such decision was made in consultation with members of the Executive Team and Peter.

EXHIBIT 1

19.     On February 11, 2022, the Fontainebleau filed a demand for arbitration with the Judicial Arbitration and Mediation Service ("JAMS"), which instituted the arbitration action entitled *Fontainebleau Florida Hotel, LLC vs. National Association of Television Programming Executives*, JAMS case no. 5460000066, JAMS Resolution Center, Miami, Florida (the "Arbitration").

20.     At the time the Arbitration was instituted, NATPE had a liability insurance policy with Navigators Insurance Co. ("Navigators") entitled "Not-For-Profit InNAVation Policy" (the "Policy"). Plaintiff is informed and believes that the Policy could have provided coverage for the allegations in the Arbitration provided a timely claim was made by NATPE against the Policy. For reasons unknown, Defendants failed to make a claim on the Policy at the time the Arbitration was instituted.

21.     In May of 2022, an attorney for Fontainebleau sent a letter to Peter that raised potential claims against the officers and directors of NATPE for their actions in connection with the cancellation of the 2022 Event.  On or about June 16, 2022, Peter sent a letter to Navigators tending the Arbitration under the Policy.  Navigators responded by denying coverage due to the failure of NATPE to make a timely claim on the Policy as required by its terms within 90 days of NATPE's learning of the Arbitration.

22.     Peter contested on NATPE's behalf Navigators' denial of coverage through litigation in State Court which was removed to Federal Court.  However, Peter lost the litigation and Navigators was not required to cover the damages and fees associated with the Arbitration.

23.     Plaintiff is informed and believes that Bommel and Peter were aware of the Policy at the time of the serving of the demand for arbitration.  However, it was not until the directors and officers were directly threatened with litigation that Bommel and Peter sought the protections of the Policy, by which time it was too late. This was another example of Bommel and Peter prioritizing the interests of the executives of NATPE over the organization itself.

24.     The financial impact from the cancellation of the 2022 Event was profound,

EXHIBIT 1

1   a fact that was communicated to Bommel, the Executive Team and the NATPE Board of

2   Directors in March of 2022 through internal company communications.

3       25.    NATPE's Form 990 federal income tax return for the fiscal year ending

4   March 31, 2022 (the "3/31/22 Tax Return") provided a picture of NATPE the rapidly

5   deteriorating financial condition. Program service revenue was reduced to $544,707, with

6   contribution and grant revenue of $312,698, and investment income of $117,224, equaling

7   total revenue of just $974,629. Total expenses for NATPE remained relatively the same

8   at $3,020,885, resulting in negative income of $2,046,256.

9       26.    The balance sheet side of the 3/31/22 Tax Return was equally dire, though

10   the situation was in fact much worse than what was reflected in the return. NATPE

11   disclosed total assets in the 3/31/22 Tax Return of $2,616,816, and liabilities of

12   $1,592,759, the majority of which liabilities consisted of funds collected for future events

13   that had yet to be earned. This left an apparent net asset value of $1,024,057. However,

14   the disclosed liabilities did not take into account the asserted FB Liquidated Damages

15   $3,389,618.69, which if reflected would show a negative asset value of $2,365,561,

16   placing NATPE deeply into insolvency.

17       27.    With obligations to creditors reaching over $4.9 million and available cash of

18   approximately $2.6 million as of March of 2022, NATPE's Board of Directors and Executive

19   Team in consultation with Peter had a fiduciary duty to manage the organizations scarce

20   resources in a manner that did not place creditors at undue risk of non-payment through

21   risky business ventures and self-dealing transactions that benefited themselves and other

22   insiders. Unfortunately, this is precisely the direction adopted by Bommel and the

23   Executive Team with Peter's guidance. Instead of adopting a conservative approach that

24   would preserve NATPE's assets and minimize the harm to its creditors, Bommel, the

25   Executive Team and Peter spent over $1 million of the organization's funds on themselves.

26       28.    In April of 2022, at a point when NATPE's financial condition was in free-fall,

27   Bommel and NATPE's compensation committee decided to authorize Bommel to received

28   deferred compensation and entered into a new employment contract with him that

EXHIBIT 1

1   provided for a generous severance payment.  At the same time, Peter was doing more

2   and more work for NATPE, billing the organization on multiple matters related to the

3   Arbitration, employment issues, contract issue, and eventually consulting on bankruptcy

4   issues.

5           29.     In the weeks and days leading up to the filing of the Bankruptcy Case, at

6   which point Bommel and Peter were actively involved in attempting to sell NATPE's

7   business, Peter assisted Bommel with the preparation of various termination agreements

8   for the Executive Team, which included generous severance payments which clearly

9   harmed NATPE's creditors by continuing to drain NATPE of cash while it had ceased to

10  conduct business.  All of these actions were taken by Bommel while, as set forth below,

11  NATPE was undercapitalized, insolvent, and unable to pay its debts as they became due

12  in the ordinary course of business.

13          30.     From the January 8, 2022, the date on which NATPE cancelled the 2022

14  Event, to the Petition Date – at Bommel's direction, NATPE paid the following amounts to

15  Bommel, members of the Executive Team and Peter's law firm –

16  -       Bommel = $450,000.  This included substantial deferred compensation,

17          contractual severance and vacation pay, and a separate employee

18          severance payout.  This included approximately $150,000 in severance

19          and vacation "buyout".

20  -       The Peter Law Group = $221,410.50

21  -       Charlie Weiss $53,461.53

22  -       Wayneston Harbeson $56,538.50

23  -       Gary Mitchell = $65,243.94

24  -       The Lippin Group, Inc. a Public Relations firm controlled by NATPE director

25          and board member Richard B. Lippin = $125,000

26          31.     NATPE paid over $825,000 to creditors during the 90 days before the

27  Petition Date, the bulk of which went to Bommel, Peter's law firm, and the Executive

28  Team.

8

EXHIBIT 1

32.     Even after the Bankruptcy Case was filed, Bommel, the Executive Team and Peter managed to continue their pattern of expending NATPE's dwindling cash reserves on themselves.

33.     Immediately prior to the Petition Date, NATPE terminated all of its employees effective October 14, 2022. These terminations included severance packages.

34.     NATPE filed for bankruptcy protection on October 11, 2022 (the "Petition Date"). NATPE elected to proceed as a Supchapter V debtor for the purpose of liquidating the Debtor's assets. According to NATPE's Schedules of Assets and Liabilities [Docket No. 40 (the "Schedules")], as of the Petition Date, its assets totaled approximately $533,834.75.

35.     On November 9, 2022, the Debtor filed a motion seeking a Bankruptcy Court order authorizing it to pay commissions, employee benefits and payment of related taxes and tax deposits, as well as approval of severance plans for its "critical" employees (the "Wage Motion," Dkt. No. 16).

36.     The Wage Motion sought Bankruptcy Court approval to pay the following individuals and amounts:

- Wayneston Harbeson: Severance $39,487.70; proposed priority wage payment of $15,150;

- Charlie Weiss: Severance $10,930.36 as priority wages;

- Stephanie Berlhinque: Severance $3,597.70; commissions $7,580.00, total as proposed priority wages of $11,177.70;

- Rebecca Shotland: Severance $3,522.46; commissions $7,375.00, total as proposed priority wages of $10,897.46; and

- Sylvia Jagheshar: Severance $22,784.25; proposed priority wage payment of $15,150.00.

37.     Fontainbleau filed an opposition to the Wage Motion on November 16, 2022 (Dkt. No. 24). On November 22, 2022, the Debtor voluntarily dismissed the Wage Motion and never obtained Bankruptcy Court approval for payment of any of the pre-petition

EXHIBIT 1

wages (Dkt. No. 32). However, what NATPE failed to mention in the Wage Motion was that the payment of the pre-petition wages – even the amounts that exceeded the priority wage maximum, were already paid by the Debtor in the days immediately after the Petition Date as reflected in the Debtor's first Monthly Operating Report for the period October 11, 2022 through October 31, 2022 (Dkt. No. 34).

38.    Estate assets were further dissipated by Bommel post-petition through various "Independent Contractor" agreements which are believed to have been drafted by Peter. Under these Independent Contract agreements, Bommel, Mitchell, Harbeson, and Lee continued to receive payments from the Debtor as consultants as opposed to employees. Plaintiff is informed and believes each of these individuals received at least the following amounts post-petition:

-    Bommel, Executive Consulting Agreement = $92,312.50

-    Edward Jones, Asset Management Agreement = $3,870.00

-    Gary Mitchell, International Sales Rep Agreement = $2,015

-    Ming-Fen Lee, International Sales Rep Agreement = $4,029.31

-    The Lippin Group, Inc., PR Service contract =$5,000

39.    In addition to making post-petition payments to NATPE's former pre-petition employees, Bommel continued to pay Pery Consulting Group, LLC ("PCG"), for outside professional services including CFO, Controller and Accounting Manager pursuant to a Vendor Agreement between NATPE and PCG dated November 16, 2020 (the "PCG Agreement"). The PCG Agreement provided for a monthly fee of $7,000, which NATPE regularly paid through July of 2022. However, in or around September of 2022, there was a modification of the PCG Agreement, and the monthly fee increased to $12,500. As a result, PCG continued to receive post-petition consulting fees during the Bankruptcy Case from October of 2022 through May of 2022 which totaled $87,500. Given that NATPE had effectively ceased operating by the Petition Date, and subsequently sold all of its assets by January of 2023, the Debtor was receiving little benefit from the type of services that PCG was allegedly providing, showing continued financial mismanagement well after the

EXHIBIT 1

1   filing of the Bankruptcy Case.

2       40.     Immediately after the Petition Date, the Debtor sought to liquidate on an

3   extremely compressed timeline in the Bankruptcy Case. NATPE did not require the

4   "consulting" services of these individuals and companies and as such, these expenditures

5   were just a further exercise in self-dealing by the NATPE executives and insiders. To

6   make matters worse, several members of the Executive Team, including Harbeson,

7   Wiess, Mitchell and Lee, began working with competitors of NATPE prior to the close of

8   the proposed sale its customer list, bringing into question the loyalties of these individuals

9   who were continuing to receive consulting fees from NATPE at that time. This was another

10   example of the NATPE executives placing their own self interests over those of the Estate,

11   as had been the pattern prior to the Petition Date.

12       41.     The continued erosion of the Debtor's cash continued in the Bankruptcy

13   Case for nearly two years, leaving the Estate with less than $120,000 by the time Plaintiff

14   was appointed. The only apparent beneficiaries of the bankruptcy process were the Estate

15   professionals and insiders. One of the professionals was Peter, who continued to serve

16   as counsel to the Debtor despite the clear claims the Estate had against him for

17   professional negligence when he failed to timely seek coverage under NATPE's insurance

18   policy for the Arbitration. The obvious strategy of Peter was to not only continue to use

19   Estate resources to his own benefit, but to also try and run out the clock on the statutes of

20   limitations that are now faced by Plaintiff.

21       42.     Shortly after the Petition Date, NATPE sold substantially all of its assets for

22   $150,000 as well as the assumption of certain assumed deferred revenue liabilities of the

23   Debtor through a Court-approved sale (the "Asset Sale," Dkt. No. 48). The Court approved

24   the Asset Sale on January 6, 2023, and there were no further operations (Dkt. No. 59).

25       43.     The Debtor filed its liquidating plan January 9, 2023 (Dkt. No. 61).

26       44.     On September 17, 2024, Plaintiff was appointed as the Plan Fiduciary to

27   administer the Debtor's Estate in which capacity he continues to serve.

28       45.     As of the Petition Date, the Debtor was indebted to Fontainebleau Florida

EXHIBIT 1

1 Hotel, LLC dba Fontainebleau Florida LLC d/b/a Fontainebleau Miami Beach Hotel

2 ("Fontainebleau") in the amount of no less than $3,414,618.69, plus prejudgment interest

3 and attorney's fees and costs.

4     46.    Plaintiff is informed and believes that within the one year prior to the Petition

5 Date, Bommel received the transfers from the Debtor totaling in excess of $450,000 (the

6 "Bommel 1-Year Transfers").

7     47.    Plaintiff is informed and believes that the Bommel 1-Year Transfers included

8 substantial deferred compensation, contractual severance and vacation pay, and a

9 separate severance payout.   This included approximately $150,000 in severance and

10 vacation "buyout."

11     48.    Plaintiff is informed and believes that Bommel's employment contract

12 creating the severance obligation was entered into on April 1, 2022, while Debtor was

13 engaged in Arbitration with Fontainebleau.

14     49.    Plaintiff is informed and believes that within the one year prior to the Petition

15 Date, Peter received the transfers from the Debtor totaling in excess of $421,783, of this

16 amount, $221,410.50 was paid within the 90 days prior to the Petition Date, including a

17 single payment of $76,642.25 on September 26, 2022 (the "Peter Pre-Petition Transfers,"

18 and collectively referred to herein with the Bommel 1-Year Transfers as the Preferential

19 Transfers).

20     50.    Plaintiff is informed and believes that the Debtor had a property interest in

21 the funds that made up each of the Preferential Transfers as each of the Preferential

22 Transfers were drawn against and cleared one or more of the Debtor's bank accounts.

23     51.    Plaintiff is informed and believes that each of the Preferential Transfers was

24 paid on account of outstanding debt(s) owed by the Debtor to Defendants at the time the

25 payments were made.

26     52.    Plaintiff is informed and believes that the Debtor did not receive reasonably

27 equivalent value in exchange for the severance and deferred compensation payments to

28 Bommel, including the Bommel 1 Year Transfers, and these payments were fraudulent.

EXHIBIT 1

53.   Prior to commencing this action, Plaintiff performed reasonable due diligence regarding Defendants' potential affirmative defenses to the claims asserted herein.  The due diligence was performed with the assistance of Plaintiff's counsel and accountants by reviewing the Debtor's books and records, analyzing payments made by the Debtor to Defendants, and confirming associated information regarding Defendants' invoices to the Debtor.

54.   Plaintiff is informed and believes that after the Petition Date, Bommel received at least $200,015.00 from the Debtor (the "Post-Petition Transfers").

55.   Plaintiff is informed and believes that the Debtor had a property interest in the funds that made up each of the Post-Petition Transfers which were drawn against and cleared one or more of the Debtor's bank accounts.

56.   Plaintiff is informed and believes, that at all relevant times herein, Bommel had access to, and exercised control over, all of NATPE's bank accounts.

### FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – against Bommel)

57.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

58.   During the relevant period, Bommel was an officer and/or director of the Debtor, and as such, owed fiduciary duties of care and loyalty to the Debtor and owed a duty not to engage in self-dealing conduct that could harm the Debtor. Moreover, these duties were heightened because the Debtor was a non-profit organization.

59.   In addition, Bommel also owed a duty of care to act with minimal competency to ensure that the Debtor was operated in accordance with the law, as well as a duty of loyalty to avoid placing his own interests ahead of the Debtor's interests, which prohibited him from undertaking or participating in activities adverse to the interests of the Debtor and its creditors and the duty to account to the Debtor to and keep it fully informed as to all matters pertaining to its interests.

60.   Moreover, Bommel owed the same fiduciary duties to the Debtor's creditors

13

EXHIBIT 1

1  because the Debtor was insolvent.

2        61.    The fiduciary duties of loyalty and good faith required that Bommel act in the

3  best interests of the Debtor and its creditors rather than his own self-interest, and to

4  correspondingly refrain from self-dealing, conflicts of interest, and prioritizing his own

5  personal gain or the enrichment of directors and officers at the expense of the Debtor.

6  Bommel was also required to ensure that the Debtor's resources were used for a pubic

7  benefit and avoid acting for purposes other than advancing the Debtor and its creditors'

8  best interests and to avoid failing to act when he had a known duty to act. Additionally,

9  Bommel was required under the duties of loyalty and good faith to exercise a level of

10  diligence in operating the Debtor's business such that he did not act grossly negligent or

11  disregard corporate formalities and financial reality.

12        62.    Because Bommel was ultimately responsible for overseeing the day-to-day

13  business operations and financial performance of the Debtor and involved in supervising

14  all aspects of the Debtor's financial affairs, at all relevant times, he was well aware of the

15  dire financial condition and insolvency of the Debtor. Despite this knowledge, Bommel

16  failed to act in good faith, and caused the Debtor to make the above-described distributions

17  to or for himself, Peter, the Executive Team and the others, as well as preferring some

18  creditors over other creditors while the Debtor was in severe financial distress. Bommel's

19  substantial payments to himself amounted to self-dealing, and included improperly

20  authorizing his severance and deferred compensation package while the Debtor was

21  insolvent in violation of Debtor's rights and obligations to its creditors. In so doing, Bommel

22  breached his fiduciary duties to Debtor.

23        63.    Additionally, Bommel committed numerous other acts and omissions in

24  blatant violation of law or policy giving rise to claims for breach of fiduciary duty, including,

25  but not limited to:

26      a.  Ignoring conflicts of interests;

27      b.  Failing to report and mishandling of insurance coverage issues;

28      c.  Mismanaging the Debtor's affairs for personal gain or failing to act in the Debtor's

             EXHIBIT 1

1   best interests;

2   d.  Failing to ensure that the Debtor's resources were used to achieve its public benefit

3        purposes as a non-profit organization;

4   e.  Withholding knowable information material to the Debtor's board and creditors;

5   f.   Transferring the Debtor's business operations (and employees) to competitors;

6   g.  Authorizing substantial severance and deferred compensations packages to

7        employees while the Debtor was insolvent.

8        64.    Consequently, per the allegations herein, Bommel breached his fiduciary

9   duties as an officer and director of the Debtor, and was a direct and proximate cause of,

10  and a substantial factor in causing damage to the Debtor and its creditors in the amount

11  of the transfers made by the Debtor to or for his own benefit and the benefit of the other

12  insiders, and preferring some creditors over other creditors, improperly authorizing

13  deferred compensation and severance payments while the Debtor was in severe financial

14  distress.

15       65.    These breaches of fiduciary duty directly contributed to the Debtor filing for

16  bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby

17  damaged NATPE in an amount to be proven at trial, but currently estimated to be at least

18  $4 million.

19                           **SECOND CLAIM FOR RELIEF**

20            **(Aiding and Abetting Breach of Fiduciary Duty – against Peter)**

21       66.    Plaintiff realleges and incorporates herein by reference each and every

22  allegation contained in all prior paragraphs of this Complaint.

23       67.    Peter was aware Bommel owed fiduciary duties to the Debtor.

24       68.    Peter knowingly, recklessly, and /or negligently engaged in conduct to aid

25  and abet Bommel's breaches of fiduciary duty described above.

26       69.    As a direct and proximate result of Peter aiding and abetting Bommel's

27  breaches of fiduciary duty, the Debtor has been damaged in an amount subject to proof at

28  trial, which sum is believed to be in excess of $4 million.

EXHIBIT 1

## THIRD CLAIM FOR RELIEF

### (Corporate Waste – against Bommel)

70. Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

71. An officer of an entity may be held liable where he causes the entity to enter into transactions in which no person of ordinary sound business judgment could view the benefits received in such transaction by the entity as a fair exchange for the consideration paid by the entity.

72. Bommel caused Debtor to enter into numerous transactions for which it received very little or no consideration without limitation, Bommel made payments, to himself, Peters, various insiders out of the Bank Accounts and for which NATPE received very little or nothing in return.

73. In addition, Bommel actively mismanaged and failed adequately oversee the Debtor's finances and continued to engage in self-dealing, irrationally squandered corporate assets, and actively drained the Debtor's cash in the months leading up to NAPE's bankruptcy filing, thereby causing unreasonable and knowable losses to NATPE where no businessperson of ordinary and sound judgment could conclude that the corporation has received adequate consideration.

74. Bommel's actions were egregious or irrational and were not based on a valid assessment of NATPE's best interests and amounted to Corporate Waste.

75. As a direct and proximate result of Bommel's conduct, the Debtor has been damaged in an amount subject to proof at trial, which sum is believed to be in excess of $4 million.

## FOURTH CLAIM FOR RELIEF

### (Negligence – Legal Malpractice Against – Peter)

76. Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

77. Peter acted as general counsel for the Debtor from at least 2010 until 2024.

EXHIBIT 1

1   During this time, the Peter represented the Debtor in multiple different capacities.

2       78.    In representing the Debtor, Peter owed a professional duty to use such skill,

3   prudence and diligence as other members of his profession commonly possess and

4   exercise under the circumstances in the performance of the tasks which they undertake.

5   This included a duty to avoid representation of interests adverse to the Debtor and withdraw

6   from representation when a conflict of interest arose.

7       79.    Peter breached his professional duty to the Debtor by his ongoing

8   mishandling of insurance coverage issues. The Debtor suffered at least (i) the loss of

9   coverage for its defense fees in Arbitration, which would have been covered had Peter

10  timely tendered the claim to Debtor's liability insurance carrier Navigators Insurance Co.

11  ("Navigators"), which is no less than $218,410.50, the amount paid to Peter during the 90-

12  day preference period; (ii) the loss of potential coverage for Debtor's liabilities stemming

13  from its disputes with Fontainebleau, including but not limited to the Arbitration, and (iii) the

14  fees and costs incurred in the coverage litigation against Navigators.

15      80.    Additionally, Peter breached his professional duty to the Debtor by, among

16  other things:

17      a.   Disclosure failures and misrepresentations in connection with Peter's

18           Application for employment as Special Counsel in the Bankruptcy Case.

19      b.   Peter failed to disclose his adverse interests to the Estate with respect to

20           its post-petition billing of the Estate in connection with potential fraudulent

21           transfer claims against Peter;

22      c.   Counseling in favor of payment of deferred compensation, severance, and

23           vacation pay to Debtor's Insiders and employees despite Debtor's

24           insolvency or near insolvency;

25      d.   Counseling in favor of Debtor's cancellation of the 2021 Agreement;

26      e.   Counseling in favor of Debtor's cancellation of the 2022 Agreement;

27      f.   Counseling in favor of Debtor's breach of the 2021 Settlement Agreement;

28      g.   Counseling in favor of other fraudulent transfers discussed above;

EXHIBIT 1

h.   Failing to disclose conflicts of interest and/or recuse Peter from

employment following ;

i.   Counseling and preparing independent contractor agreements for Debtor's

former employees who continued to perform in the same capacity as the

Debtor in violation of California employment laws and possibly state and

federal tax laws;

j.   Failing to advise the Debtor that its prepetition compensation to insiders

was excessive and in breach of such insider's fiduciary duties to the

Debtor.

81.   Peter's negligence directly contributed to the Debtor filing for bankruptcy and depleted the Estate's assets both pre- and post-petition, and thereby damaged NATPE.

82.   As a direct and proximate result of Peter's breaches, the Debtor has been damaged in an amount subject to proof at trial, which sum is believed to be in excess of $4 million.

## FIFTH CLAIM FOR RELIEF

**(Avoidance of Intentionally Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A) –**

**against Bommel)**

83.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

84.   Plaintiff is informed and believes that within two years of the Petition Date, the Debtor made certain transfers to, or for the benefit of Bommel totaling at least $450,000 (the "2-Year Transfers").

85.   Plaintiff is informed and believes that the 2-Year Transfers constituted an interest in property of the Debtor.

86.   Plaintiff is informed and believes and thereupon alleges that the 2-Year Transfers were transfers that were made with the actual intent to hinder, delay and defraud the creditors of the Debtor.

87.   Plaintiff is informed and believes that at the time the 2-Year Transfers were

EXHIBIT 1

1 paid to Bommel, the Debtor was in serious financial distress and was not paying its debts

2 as they came due and was facing substantial claims for its breaches of the 2021 and 2022

3 Agreements with Fontainebleau and involved in Arbitration.

4        88.    Plaintiff is informed and believes that the 2-Year Transfers included

5 payments for substantial deferred compensation, contractual severance and vacation pay,

6 and separate severance payouts for which the Debtor did not receive reasonably

7 equivalent value.

8        89.    Plaintiff is entitled to avoid and set aside the 2-Year Transfers pursuant to

9 11 U.S.C. § 548(a)(1)(A).

10 **SIXTH CLAIM FOR RELIEF**

11 **(Avoidance of Constructively Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B)**

12 **– against Bommel)**

13        90.    Plaintiff realleges and incorporates herein by reference each and every

14 allegation contained in all prior paragraphs of this Complaint.

15        91.    Plaintiff is informed and believes that on or within two years before the

16 Petition Date, the Debtor made the 2-Year Transfers to, or for the benefit of Bommel.

17        92.    Plaintiff is informed and believes that the 2-Year Transfers were transfers of

18 property in which the Debtor had an interest.

19        93.    Plaintiff is informed and believes that the Debtor did not receive reasonably

20 equivalent value in exchange for any of the 2-Year Transfers.

21        94.    Plaintiff is informed and believes that at the time of the 2-Year Transfers the

22 Debtor was insolvent or became insolvent as a result thereof.

23        95.    At all relevant times within the two years prior to the Petition Date, the Debtor

24 (i) was insolvent, or became insolvent as a result of each such transfer; (ii) was engaged

25 in or was about to engage in a business or a transaction for which its remaining assets

26 were unreasonably small in relation to the business or transaction; or (iii) intended to incur,

27 or believed or reasonably should have believed that it would incur, debts beyond its ability

28 to pay as they became due.

EXHIBIT 1

96.     Plaintiff is entitled to avoid and set aside the 2-Year Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

### SEVENTH CLAIM FOR RELIEF

**(Avoidance of Preferential Transfers Under 11 U.S.C. § 547 –**

**against all Defendants)**

97.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in all prior paragraphs of this Complaint.

98.     Plaintiff is informed and believes that the Preferential Transfers were a transfer of an interest of the Debtor in property.

99.     Plaintiff is informed and believes and thereupon alleges that the Preferential Transfers were made to the Defendants or for the benefit of the Defendants.

100.    Plaintiff is informed and believes that the Preferential Transfers were made to or for the benefit of Defendants at a time in which Defendants were a creditor of the Debtor, as the term "creditor" is defined by 11 U.S.C. § 101(10).

101.    Plaintiff is informed and believes that the Preferential Transfers were made for or on account of an antecedent debt owed by the Debtor to Defendants.

102.    Plaintiff is informed and believes that the Preferential Transfers were made while the Debtor was insolvent.

103.    Plaintiff is informed and believes that the Preferential Transfers enabled Defendants to receive more than it would have received as a creditor if: (a) the Preferential Transfers had not been made; and (b) Defendants received payment of the debts they were owed to the extent provided under the Bankruptcy Code.

104.    Plaintiff is informed and believes that interest on the Preferential Transfers has accrued and continues to accrue at the maximum legal rate pursuant to 28 U.S.C. § 1961 from the time the Preferential Transfers were made.

105.    Plaintiff performed reasonable due diligence in the circumstances of Defendants' known or reasonably knowable affirmative defenses.

106.    Plaintiff is entitled to avoid and set aside the Preferential Transfers pursuant

20

EXHIBIT 1

1   to 11 U.S.C. § 547.

2   **EIGHTH CLAIM FOR RELIEF**

3   **(Avoidance of Post-Petition Transfers Under 11 U.S.C. § 549 – against Bommel)**

4       107.   Plaintiff realleges and incorporates herein by reference each and every

5   allegation contained in all prior paragraphs of this Complaint.

6       108.   Plaintiff is informed and believes that the Post-Petition Transfers were

7   transfers of property of the Estate.

8       109.   Plaintiff is informed and believes that the Post-Petition Transfers occurred

9   after the commencement of the Debtor's Bankruptcy Case.

10       110.   Plaintiff is informed and believes that the Post-Petition Transfers were not

11   authorized by the Bankruptcy Court or made in accordance with the provisions of the

12   Bankruptcy Code.

13       111.   Plaintiff is entitled to avoid the Post-Petition Transfer pursuant to 11 U.S.C.

14   § 549.

15   **NINTH CLAIM FOR RELIEF**

16   **(Conversion – against all Defendants)**

17       112.   Plaintiff realleges and incorporates herein by reference each and every

18   allegation contained in all prior paragraphs of this Complaint.

19       113.   As described above, the Debtor disposed of its assets to Defendants, the

20   Executive Team, and others leading up, and subsequent, to this bankruptcy case, despite

21   the Debtor's own dire financial circumstances.

22       114.   Defendants exerted control over the Debtor's assets, and knowingly

23   participated in, or was negligent in the management and supervision of the Debtor's affairs

24   causing or contributing to the Debtor's ultimate liquidation.

25       115.   These assets are rightfully the property of the Estate, as they were

26   transferred to the Debtor's insiders or entities controlled by the Debtor's insiders, who used

27   the Debtor for their own convenience and benefit and disregarded the Debtor's public

28   purpose as a non-profit organization and were outside of the ordinary course of business.

1    Moreover, to the extent that the subject transfers were made post-petition, they were not

2    authorized by the Bankruptcy Code or the Bankruptcy Court.

3        116.   Consequently, the recipients of these assets now wrongfully have control

4    over the Debtor's assets, in an amount which shall be proven at trial, but currently

5    estimated to be at least $2 million, which are rightfully Estate property.

6        117.   Defendants' acts were undertaken for improper purposes as alleged above

7    and were willful, wanton, deliberate, malicious, and in conscious disregard of the rights of

8    the Estate's creditors, and were designed and intended to cause and did, in fact, cause the

9    Estate's creditors to suffer actual damages and therefore justify the awarding of exemplary

10   and punitive damages.

11              **TENTH SEVENTH CLAIM FOR RELIEF**

12      **(Recovery of Avoided Transfers 11 U.S.C. § 550 – against all Defendants)**

13       118.   Plaintiff realleges and incorporates herein by reference each and every

14   allegation contained in all prior paragraphs of this Complaint.

15       119.   Plaintiff is informed and believes that the Preferential Transfers, the 2-Year

16   Transfers, and the Post-Petition Transfers (collectively, the "Transfers") are avoidable,

17   variously, pursuant to 11 U.S.C. §§ 547, 548, and/or 549.

18       120.   Plaintiff is informed and believes that Defendants and Does 1-50, inclusive,

19   were, variously, the initial transferee and/or was the entity for whose benefit the Transfers

20   were made or the mediate or immediate transferee of the Transfers.

21       121.   Plaintiff, therefore, is entitled to recover and preserve the Transfers from

22   Defendants for the benefit of the Estate pursuant to 11 U.S.C. §§ 550(a) and 551, plus

23   interest at the maximum legal rate from and after the date of each of the Transfers.

24              **ELEVENTH CLAIM FOR RELIEF**

25        **(Unjust Enrichment – against all Defendants)**

26       122.   Plaintiff realleges and incorporates herein by reference each and every

27   allegation contained in all prior paragraphs of this Complaint.

28       123.   Plaintiff is informed and believes that Defendants engaged in wrongful and

EXHIBIT 1

1   inappropriate conduct as described above, without valid justification or excuse which

2   resulted in harm to the Debtor. Such conduct includes, but is not limited to, breaching their

3   fiduciary duties of loyalty, care and good faith.

4        124.    Defendants' actions were targeted at Fontainebleau and almost certain to

5   cause financial harm to its creditors and primarily Fontainebleau by intentionally depleting

6   the Debtor's resources without just cause at a time when the Debtor faced substantial

7   liability to Fontainebleau and was insolvent.

8        125.    In many cases, Defendants received benefits from such conduct that were

9   rightly due to the Debtor or its creditors.  Defendants had actual knowledge or reasonable

10  foreseeability that their conduct would result in injury and substantially harm the Debtor's

11  creditors.

12       126.    It would be unjust for Defendants to retain such benefits.

13       127.    Plaintiff is entitled to restitution from the Defendants in an amount subject to

14  proof at trial.

15                        **TWELFTH CLAIM FOR RELIEF**

16      **(Disallowance of Claim - 11 U.S.C. § 502(d) – against all Defendants)**

17       128.    Plaintiff realleges and incorporates herein by reference each and every

18  allegation contained in all prior paragraphs of this Complaint.

19       129.    Defendants are a transferee of property subject to avoidance pursuant to 11

20  U.S.C. §§ 547, 548, and/or 549.

21       130.    Plaintiff may recover the property transferred by the Transfers, or the value

22  thereof, from Defendants pursuant to 11 U.S.C. § 550(a).

23       131.    Defendants have not paid the amount or turned over the property to the

24  Estate for which they are liable pursuant to 11 U.S.C. § 550(a).

25       132.    Plaintiff is entitled to disallowance of any claim against the Estate asserted

26  by Defendants, pursuant to 11 U.S.C. § 502(d) and Rule 3001(c) of the Federal Rule of,

27  because Defendants, and each of them are a transferee of property pursuant to 11 U.S.C.

28  §§ 547, 548, and/or 549.

EXHIBIT 1

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment hereon ordering the following relief.

**On the First and Second Claims for Relief:**

1.      Compensatory, special and consequential damages, disgorgement of all sums received by Defendants for the period in which they were in breach of fiduciary duties or aiding and abetting that breach, and punitive damages from Defendants, the exact amount of which to be proved at trial, and presently alleged to be no less than $4 million;

**On the Third Claim for Relief**

2.      Compensatory, special, and consequential damages, and punitive damages, all in an amount to be determined at trial;

**On the Fourth Claim for Relief**

3.      Compensatory, special and consequential damages, the exact amount of which to be proved at trial, and presently alleged to be no less than $4 million;

**On the Fifth, Sixth, Seventh, Eighth and Tenth Claims for Relief:**

4.      Avoiding, recovering, and preserving the subject Transfers, directing that the subject Transfers of the Debtor's money and property be set aside, and recovering the subject Transfers, or the value thereof, from the Defendants for the benefit of the Debtor's bankruptcy estate, all in an amount to be determined at trial, which sums are believed to be in excess of $2 million;

**On the Ninth Claim for Relief:**

5.      Compensatory damages and punitive damages, the exact amount of which to be proved at trial, and presently alleged to be no less than $2 million;

**On the Eleventh Claim for Relief:**

6.      Restitution and disgorgement of all amounts unjustly held by the Defendants, the exact amount of which to be proved at trial, and presently alleged to be no less than $1 million;

**On the Twelfth Claim for Relief:**

7.      For disallowance of any claims asserted by Defendants, pursuant to 11

24                                      EXHIBIT 1

U.S.C. § 502(d);

**On all Claims for Relief:**

8.   For costs of suit and interest at the legal rate on all damages and sums awarded to Plaintiff, for the benefit of the Estate; and

9.   For such other and further relief as this Court deems just and proper.

DATED:  October 11, 2024                    **MARGULIES FAITH, LLP**


By: _Samuel Boyamian_
Meghann A. Triplett
Samuel M. Boyamian
Attorneys for Plaintiff, Jeremy W. Faith,
Chapter 11 Plan Fiduciary

EXHIBIT 1

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

**FILED**

**OCT 11 2024**

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Jeremy W. Faith, Chapter 11 Plan Fiduciary | Jean-Pierre Bommel, Arnold P. Peter d/b/a Peter Law Group |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Meghann A. Triplett     Phone: (818) 705-2777 Margulies Faith, LLP 16030 Ventura Blvd., Suite 470, Encino, CA 91436 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor     ☒ Other ☐ Trustee | ☐ Debtor     ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor     ☒ Other ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Breach of Fiduciary Duty; (2) Aiding and Abetting Breach of Fiduciary Duty; (3) Corporate Waste; (4) Negligence; (5) Avoidance of Fraudulent Actual Transfers; (6) Avoidance of Constructively Fraudulent Transfers; (7) Avoidance of Preferential Transfers; (8) Avoidance of Unauthorized Post-Petition Transfers; (9) Conversion; (10) Recovery of Avoided Transfers; (11) Unjust Enrichment; (12)

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☒1 12-Recovery of money/property - §547 preference
☒2 13-Recovery of money/property - §548 fraudulent transfer
☒3 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☒4 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

**EXHIBIT 1**

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
|---|---|
| NAME OF DEBTOR<br>National Association of Television Program Executives, Inc. | BANKRUPTCY CASE NO.<br>1:22-bk-11181-MB |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>San Fernando Valley | NAME OF JUDGE<br>Martin R. Barash |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) |
|---|
| |

| DATE<br>10/11/24 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Samuel M. Boyamian |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.

EXHIBIT 1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 100 Spectrum Center Drive, Suite 600, Irvine, CA 92618.

A true and correct copy of the foregoing document entitled (*specify*): **JEAN PIERRE BOMMEL'S OPPOSITION TO CHAPTER 11 PLAN FIDUCIARY'S MOTION FOR TURNOVER OF RECORDED INFORMATION RELATING TO THE DEBTOR'S PROPERTY OR FINANCIAL AFFAIRS IN THE POSSESSION OF ITS FORMER DIRECTORS; DECLARATION OF JEAN PIERRE BOMMEL IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_July 7, 2025_**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**COUNSEL FOR JEREMY W. FAITH, CHAPTER 11 PLAN FIDUCIARY:** Samuel Mushegh Boyamian
samuel@marguliesfaithlaw.com, Angela@MarguliesFaithLaw.com; Vicky@MarguliesFaithLaw.com;
Amber@MarguliesFaithLaw.com
**INTERESTED PARTY:** Russell Clementson    russell.clementson@usdoj.gov
**COUNSEL FOR THE DEBTOR:** Leslie A Cohen    leslie@lesliecohenlaw.com,
jaime@lesliecohenlaw.com;bryn@lesliecohenlaw.com
**INTERESTED PARTY:** Christopher Cramer    secured@becket-lee.com
**CHAPTER 11 PLAN FIDUCIARY:** Jeremy Faith    Jeremy@MarguliesFaithlaw.com,
Angela@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com;Amber@MarguliesFaithLaw.com
**INTERESTED PARTY:** John-Patrick McGinnis Fritz (TR)    jpftrustee@lnbyg.com, jpf@trustesolutions.net
**INTERESTED PARTY:** David S Hagen    davidhagenlaw@gmail.com, LawOfficesofDavidSHagenCA1@jubileebk.net
**INTERESTED PARTY:** William E Ireland    wireland@hbblaw.com, edocs@hbblaw.com
**LOCAL COUNSEL FOR JEAN PIERRE BOMMEL:** Melissa Davis Lowe    mlowe@shulmanbastian.com,
avernon@shulmanbastian.com
**INTERESTED PARTY:** Michael B Lubic    michael.lubic@klgates.com,
jonathan.randolph@klgates.com,klgatesbankruptcy@klgates.com
**COUNSEL FOR JEREMY W. FAITH, CHAPTER 11 PLAN FIDUCIARY:** Jonathan Serrano    Jonathan@MarguliesFaithLaw.com,
vicky@marguliesfaithlaw.com;angela@marguliesfaithlaw.com;amber@marguliesfaithlaw.com
**INTERESTED PARTY:** Derrick Talerico    dtalerico@wztslaw.com,
maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com
**COUNSEL FOR JEREMY W. FAITH, CHAPTER 11 PLAN FIDUCIARY:** Meghann A Triplett    Meghann@MarguliesFaithlaw.com,
Angela@MarguliesFaithLaw.com;Vicky@MarguliesFaithLaw.com;Amber@MarguliesFaithLaw.com;Drew@MarguliesFaithLaw.com
**INTERESTED PARTY:** United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on
(*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 7, 2025 | Anne Marie Vernon | /s/ Anne Marie Vernon |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.